UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CRIMINAL ACTION NO. 5:12-CR-00043-TBR

UNITED STATES OF AMERICA                                                                                  Plaintiff,

v.

PHILLIP LEE GROVES                                                                                        Defendant.

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court upon Defendant Phillip Groves' motions for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c) or for a new trial pursuant to Rule 33. (Docket No. 91.) Groves has supplemented these motions upon the filing of official trial transcripts. (*See* Docket No. 127-2.) The Government has responded. (Docket No. 131.) Fully briefed, this matter is ripe for adjudication. For the reasons explained below, the Court will deny Groves' motions.

**I.**

The instant motions arise from Groves' conviction for downloading and possessing trade secrets of his former employer, White Drive Products, Inc. On October 9, 2012, Groves and two co-defendants were charged in a multi-count indictment with conspiring in the theft of trade secrets and with three substantive counts of theft of trade secrets in violation of 18 U.S.C. § 1832. (Docket No. 1.) Section 1832 provides, in relevant part:

> (a)  Whoever, with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other

1

> than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly—
> (1) steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information;
> (2) without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys such information. . . .
>
> shall . . . be fined under this title or imprisoned not more than 10 years, or both.

Following a ten-day trial, a jury determined that six of the Government's thirty-seven exhibits contained information constituting trade secrets. The jury convicted Groves of two counts of the indictment, which charged with him the substantive offense of knowingly stealing trade secrets on February 22, 2008, and February 27, 2008, respectively, with the specific intent to convert them. Groves was acquitted of the conspiracy and of one of the substantive charges; two co-defendants were acquitted of all charges. (*See* Docket No. 87.)

## II.

The Court will first address Groves' motion for acquittal under Rule 29(c). His burden is a heavy one: in addressing a motion for a judgment of acquittal, the Court must consider the evidence in the light most favorable to the prosecution, inquiring whether the evidence offered at trial was sufficient to convince a rational trier of fact beyond a reasonable doubt that all elements of the charged crimes have been established. *United States v. Graham*, 622 F.3d 445, 448 (6th Cir. 2010). However, the Court must not weigh the evidence, consider the credibility of witnesses, or substitute its judgment for that of the jury. *United States v. Chavis*, 296 F.3d 450, 455 (6th Cir. 2002). The Court affords the Government "the benefit of all inferences which can reasonably be drawn from the evidence, even if the evidence is circumstantial." *United States v.*

*Carter*, 355 F.3d 920, 925 (6th Cir. 2004). A judgment will be reversed due to insufficient evidence "only if [the] judgment is not supported by substantial and competent evidence upon the record as a whole." *United States v. Barnett*, 398 F.3d 516, 522 (6th Cir. 2005).

Groves contends that the Government's evidence was insufficient to prove beyond a reasonable doubt each of the elements of theft of a trade secret. Specifically, he first insists that no proof supports the inference that he knew that the six documents at issue were among those downloaded, that they contained trade secrets, or that Groves downloaded them with the requisite *mens rea*. Groves argues that although the Government showed that Groves downloaded 17,137 files, it provided no proof that Groves either knew that the files were trade secrets or that he downloaded them with the specific intent to convert them. Groves maintains that he did not select, one by one, which individual documents to download. No reasonable jury could have concluded that the Government established his guilt, he contends, when the evidence reflects that the alleged transfer of a trade secret occurred during a general download of documents.

Groves also challenges his conviction stemming from his download of five documents—Trial Exhibits 4, 20, 22, 24, and 98—on February 27, 2008. Groves alleges that the Government introduced no proof indicating that Groves knew that these documents were among those being downloaded, that they were trade secrets, or that he intended to convert them. In support of this argument, Groves points to the testimony of Paul Goodman, a computer tech analyst at White Drive. Goodman posited that a user would have no way to determine the contents of a particular file during a general download of thousands of documents. Goodman also testified that dated information remained on White Drive's servers indefinitely. Groves argues that as to both counts, the jury lacked a basis to conclude that he knew that Exhibit Six constituted a trade

secret, that he knowingly downloaded that document, or that he intended to convert that document in order to harm White Drive.

The Court cannot agree. Ample circumstantial evidence would support the conclusion that Groves sought to take White Drive's proprietary information as he began a new job with a competitor, Dynamic Fluid Components. White Drive Director of Human Resources Larry Dean noted that neither Groves nor co-defendant Gregory Wampler would reveal their new places of employment to him. When Dean investigated Groves' email messages, he discovered two emails sent from Groves' work address to his personal address, one entitled "Ask" and the other "map to wedding." Despite these innocuous titles, one email contained customer information and the other attached a comparative analysis of a White Drive motor against that of a competitor. (*See* Docket No. 110, Testimony of Special Agent Garner, at 4-7.) A jury could interpret these disingenuous subject lines as circumstantial evidence suggesting that Groves intended to convert White Drive's proprietary business information for the benefit of his new employer.

Moreover, the Government pointed to the signed statement that Groves gave to FBI Special Agent Jerry Garner on June 9, 2008, approximately one month after he left White Drive. Special Agent Garner read Groves' statement at trial:

> On or about April 29-30, 2008, I (without written authorization) forwarded and/or converted for my own use (and/or the unauthorized use by another) certain confidential, proprietary information belonging to my former employer Propulsys, Incorporated) from my work computer e-mail account to my personal email account . . . . This information concerned customer contact information and a "Parker" Microsoft PowerPoint Presentation.

4

(Docket No. 110 at 22:21-23:3.)[1] Groves' statement continued:

> On or about April 30 – May 5, 2008, I (without written authorization) accessed for my own use (and/or the unauthorized use by another) the following confidential, proprietary documents/information belonging to my former employer (Propulsys, Incorporated): RS vs. WR comparison Microsoft PowerPoint presentation, motor flow paths Microsoft PowerPoint presentation, parts list revision 9.1.06 (PDF file) regarding KP 101 series pumps, WH models Microsoft Excel spreadsheet, Euro component prices, component prices, and a prototype 1001 and warranty shaft seals Microsoft Excel spreadsheet.

(Docket No. 110 at 23:17-24:16.) Groves thus acknowledged his intent at the time that he sent these documents to his personal email account. Accordingly, competent evidence supports the jury's conclusion that Groves violated § 1832 by accessing and converting this information with the requisite *mens rea*.

Groves invites the Court to look to *United States v. Shiah*, No. SA-CR 06-92, 2008 U.S. Dist. Lexis 11973 (C.D. Cal. Feb, 19, 2008) (unpublished). *Shiah*'s fact pattern bears a striking resemblance to the instant one: the defendant copied 4,700 computer files belonging to his employer, Broadcom, to an external hard drive just before leaving for a new job with a competitor. He testified that before leaving, he downloaded all files relevant to his work so as to create a "tool kit," preserving a library of information to draw upon in future projects. The files he downloaded contained both trade secret information and non-confidential information. Following a bench trial, the court found that the Government failed to demonstrate that Shiah intended to convert the trade secrets to the economic benefit of someone other than Broadcom. Although the Government argued that the defendant's copying files before leaving Broadcom indicated that he intended to convert the company's trade secrets for his own benefit, the court

---

[1] Special Agent Garner then clarified that Propulsys was the parent company of White Drive. (Docket No. 110 at 23:9-11.)

rejected this argument. In an unpublished Findings of Fact and Conclusions of Law, the court explained that Shiah's explanation for his actions created a reasonable doubt as to his intent. Importantly, the court noted that Shiah obtained the documents in the normal course of his employment, with nothing suspicious about the way he initially obtained them.

Returning to Groves' arguments, the Court must first underscore the incongruent procedural postures of the two cases: *Shiah* involved a bench trial, wherein the district court, as factfinder, was free to afford whatever weight to the evidence that it deemed appropriate. In doing so, the court acknowledged its exceptionally close call in determining that the defendant's innocent explanation of his conduct yielded reasonable doubt. Here, of course, the Court does not share the *Shiah* judge's liberty to determine facts and assess credibility; unlike Shiah, Groves faced a jury that served as factfinder and rendered a verdict. The Court's role at this, the trial's epilogue, is limited to determining whether any rational trier of fact could have found the essential elements beyond a reasonable doubt. The Court may not substitute its own judgment for that of the jury.

Bearing this deference in mind, the Court cannot find that the jury's conclusion lacked a reasoned basis. As Dean testified, Groves signed a confidentiality and non-complete agreement acknowledging the sensitivity of the information he encountered at White Drive—including trade secrets—and the industry's competitive nature. (*See* Docket No. 104, Testimony of Larry Dean, at 13:8-14:2.) Groves further agreed to the following:

> That I will not, without written approval by the company, either during or subsequent to my employment, disclose to anyone outside the company or publish outside the company any confidential information. As used herein, the term "confidential information" shall include, but not be limited to, needs and developments in the way of products; manufacturing processes and

> equipment; software; engineering drawings of products and tooling; engineering data and test results; accounting information with regard to sales, cost data, pricing, customer lists; marketing data; information relative to production and manufacturing data; and any other information which, by its nature, is not in the public domain.

(Docket No. 104 at 16:23-17:9.)   The jury also heard evidence that Groves approached members of the White Drive engineering team seeking confidential information on the very day that he tendered his resignation.  (*See* Docket No. 104 at 53:14-19.)   What is more, Larry Dean testified that, put simply, there was no love lost between the three co-defendants and White Drive: Groves' emails reflect that as the group of coworkers discussed potential names for the entity that would approach White Drive's competitors, one suggested moniker was "The ABW Group"—that is, "Anybody But White."  (Docket No. 104 at 100:3-7.)   These conversations shared close proximity to Groves' voluminous downloads, which occurred close in time to meetings with White Drive's competitor and his potential new employer.

These facts raise suspicious circumstances that did not exist in *Shiah*.  Even if Groves had raised the "tool kit" defense that the California defendant relied upon, the jury had a sufficient basis to reject it.   Therefore, the Court concludes that a rational trier of fact could have determined that Groves possessed the requisite *mens rea* of the crime beyond a reasonable doubt.

### III.

Groves next posits that the items he downloaded did not actually constitute "trade secrets," as they contained readily ascertainable information that lacked intrinsic value because of its secrecy.   He insists that White Drive failed to take the requisite steps necessary to safeguard items that the Government characterized as trade secrets; for example, he charges that many of the Government's exhibits had previously been disclosed publicly in marketing and

promotional materials. He also contends that the designs of White Drive motors can be reverse engineered. Such items, he argue, are without real value. Indeed, "[i]f the owner fails to attempt to safeguard his or her proprietary information, no one can be rightfully accused of misappropriating it." H.R. Rep. No. 104-788 at 7 (1996).

The Government agrees that some of the information that Groves downloaded was publicly available: White Drive's promotional catalogues, for example, included drawings of the company's products. These drawings, then, are not trade secrets. However, the jury determined that among the items that Groves downloaded were Computer Aided Drawings (CAD) of various hydraulic motor parts. White Drive engineer Terry Hudson testified that these drawings were not available to White Drive's customers. (*See* Docket No. 112 at 8:18-10:9.) What is more, Hudson explained that although patent documents and catalog drawings contained some information about the products at issue, they lacked details regarding several key components. Without instructions as to dimensions and manufacturing processes, Hudson testified, a would-be copier would come up short. The CAD, however, would contain such information: using a baseball analogy, Hudson noted that the "CAD drawings will get you all the way home." (Docket No. 112 at 37:16-24.) Based on this testimony, the jury's conclusion that the CAD exhibits constituted trade secrets was a rational one.

Groves next accuses White Drive of "carelessly" disclosing information to outsiders. (*See* Docket No. 91 at 10-11.) He relies upon the testimony of Bob Smith, former White Drive employee, who stated that the purportedly confidential CAD drawings presented by the Government were actually regularly disseminated to third parties. Goodman, a computer technician, also testified that White Drive's computer system had no mechanism to detect voluminous downloads of information. However, the Government presented substantial

8

evidence of White Drive's attempts to safeguard the secrecy of such information. Not only did White Drive require Groves to execute both a confidentiality and a non-compete agreement, testimony reflected that it also maintained a highly secure headquarters protected by fingerprint-scan locks and access to certain files protected on a need-to-know basis. (*See* Docket No. 106, Testimony of Paul Goodman, at pp. 5-6, 11-13.) The Court again notes weighing the probative value of such testimony is the task of the jury, not the Court. Competent evidence supports the jury's determination and does not serve as a basis to acquit.

Next, the Court considers Groves' argument that the trade secrets at issue lacked any intrinsic value. Groves says that the exhibits presented by the Government consisted primarily of "dated reports, [E]xcel worksheets with formulas taken from engineering publications available to anyone and price quotes with no value by virtue of their truthfulness." (Docket No. 91 at 11.) Groves characterizes one former White Drive executive's testimony as support for his argument that "dated price quotes and two year-old strategic forecasts had no use to anyone in the industry because they were nothing but a 'pie in the sky' projection in the first place." (Docket No. 91 at 11.) However, this testimony runs afoul of that of White Drive CEO Rich Maddux, who testified that among the information that Groves downloaded in February 2008 was a products booking and shipping backlog forecast and a chart concerning new product development, including cost estimates for production of a motor that had not yet been launched. (Docket No. 107, Testimony of Rich Maddux, at pp. 23-30.) Maddux also testified to the value of other documents that Groves downloaded, some of which contained essential information that had not been widely distributed. The jury was entitled to favor Maddux's perspective. Moreover, Groves' conviction does not depend upon the jury finding that each of the Government's exhibits consisted of wholly confidential information. Here, the jury concluded

that Groves downloaded files that contained some information that was valuable because it was not generally known. This is sufficient to confer the status of "trade secrets" upon such documents.

Finally, Groves asserts that White Drive misrepresented its financial damages resulting from the theft of its trade secrets. He refutes White Drive's claim that it sustained at least $18 million in losses, arguing that were such losses legitimate, the Government surely would have introduced proof supporting this contention. According to Groves, the Government failed to verify or correct this figure before sharing it with the grand jury; he contends that this sum weighed heavily upon the grand jurors' decision to return an indictment. Groves' lengthy cross-examinations of both Garner and Dean provided the jury with ample explanation of his theory.

The Court need not disturb the jury's decision to reject Groves' argument. Special Agent Garner testified that these sums were associated with his investigation of another possible crime—economic espionage, with which none of the defendants were ultimately charged. (*See* Docket No. 110, Testimony of Special Agent Garner, at pp. 59:19-62:1.) Garner explained that the information with which Groves found fault was part of a presentation that Garner prepared for his own personal use and to facilitate his discussions about the case with counsel. (Docket No. 110 at pp. 63:5-64:15.) Moreover, Groves offered no evidence that the document was ever presented to the grand jury. (*See* Docket No. 110 at 63:20-69:3.) The jury did not accept Groves' argument that White Drive and the Government abused the grand jury process; the Court will not disturb this conclusion.

## IV.

In the alternative, Groves moves for a new trial. When considering a defendant's motion for a new trial, the Court "may vacate any judgment and grant a new trial if the interest of justice so requires." Federal Rule of Criminal Procedure 33(a). "The decision whether to grant a new trial is left to the sound discretion of the district court." *United States v. Pierce*, 62 F.3d 818, 823 (6th Cir. 1995). "A district judge, in considering the weight of the evidence for purposes of adjudicating a motion for new trial, may act as a thirteenth juror, assessing the credibility of witnesses and the weight of the evidence." *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007) (citing *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998)). Furthermore, "it is widely agreed that Rule 33's 'interest of justice' standard allows the grant of a new trial where substantial legal error has occurred." *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010). However, "new trial motions are disfavored and should be granted with caution." *United States v. Willis*, 257 F.3d 636, 645 (6th Cir. 2001) (citation omitted). The trial court should exercise this discretion "only in the extraordinary circumstances where the evidence preponderates heavily against the verdict." *United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir. 1988). The defendant bears the burden of proving that a new trial should be granted. *United States v. Davis*, 15 F.3d 526, 531 (6th Cir. 1994); *United States v. Turner*, 995 F.2d 1357, 1364 (6th Cir. 1993).

Groves levies two bases for relief, arguing that the Government failed to provide information concerning both the FBI's reports analyzing the external hard drive and the chain of custody through which the hard drive passed. He first contends that despite his requests, he received no information regarding the status of the hard drive for the period that it remained in White Drive's custody. Groves contends that two days prior to trial, pursuant to the parties' agreement, the Government provided what it characterized as the extent of the Jenks Act

material.  However, this material did not include information regarding the chain of custody, analysis, or authenticity reports.

Groves next complains that the Government did not provide him with reports of the forensic examinations of the hard drive performed by FBI forensic examiners.  Instead, he claims that he was provided only with "the report of an examination performed by a private company in a civil suit." (Docket No. 91 at 14.)  Groves contends that although he requested disclosure of all forensic reports and that the Government represented to the Court that it had provided such copies, it actually failed to do so.  (*See* Docket No. 127-2 at 2-3.)  Such reports, he speculates, could have demonstrated whether the FBI found tampering or other activity on the hard drive during the period that it was not in the possession of either Groves or the FBI.  He contends that the Government's allegedly faulty disclosures precluded him from developing these issues.

Unfortunately, the Court must consult what is at best a sparse record to determine how long White Drive possessed the hard drive before submitting it to the FBI.  Although Groves complains that the hard drive's whereabouts were unknown in the eleven months before he surrendered it to White Drive, the Government counters that Groves himself is the best person to discern this information.  According to the Government, the forensic report generated in the civil lawsuit alerted White Drive's counsel that an external USB device had been connected to Defendant Wampler's computer in March 2008.  The Government contends that White Drive then contacted Wampler's attorney and learned that Groves was in possession of the hard drive. Groves himself ultimately delivered the hard drive to White Drive's civil counsel, the Government says.  Special Agent Garner testified that White Drive's counsel produced the hard drive to the FBI in response to a federal grand jury subpoena, and it was subsequently stored

with other evidence in an FBI facility. (Docket No. 110, Testimony of Special Agent Garner, at pp. 30-35.)

Despite Groves' objections, he filed no motion to suppress the hard drive. Moreover, as the Government notes, Groves had plentiful opportunities at trial to develop his concerns concerning the chain of custody: he could have cross-examined Larry Dean about what White Drive did to or with the hard drive after Groves produced it to the company's counsel, as well as any of the three FBI agents who testified about the Bureau's involvement with and custody of the hard drive. Moreover, when Groves sought additional reports of forensic examinations during a bench conference, the Government responded that Special Agent Burden was not offering expert testimony, but merely to the files he observed on the hard drive. Groves accepted this explanation. During the same conference, the Government noted that it had provided Groves with Special Agent Ranieri's CV and a report of his findings.

The scant record notwithstanding, the Court finds that the United States provided all Jencks Act material to defense counsel prior to trial. Groves admits that his concerns go only to the weight of evidence, rather than its admissibility. The Court agrees. Whatever the merits of Groves' arguments, they do not warrant a new trial. Consequently, the Court will deny his motion.

## CONCLUSION AND ORDER

The Court has considered Groves' Motion for a judgment of acquittal or, alternatively, for a new trial, as well as the response of the United States. For the reasons set forth above, IT IS HEREBY ORDERED that Groves' Motion, (Docket No. 91), is DENIED.